# THE E. INGRAHAM COMPANY *v.* TOWN AND CITY OF BRISTOL

O'SULLIVAN, C. J., BALDWIN, WYNNE, DALY and KING, Js.

Argued April 16—decided May 17, 1957

*Frederick W. Beach* and *Wallace Barnes,* with whom, on the brief, were *Joseph M. Donovan, George T. Calder* and *Walter F. Torrance, Jr.,* for the plaintiff.

*Neil F. Murphy,* with whom were *Harry F. Pergoda* and, on the brief, *Louis F. Hanrahan,* corporation counsel, for the defendant.

O'SULLIVAN, C. J. The stipulated facts essential to this reservation are these: On October 1, 1954, the plaintiff, a manufacturing concern, was the owner of real estate and personalty located in the town of Bristol. The personalty consisted of machinery, raw materials, goods in process, finished products and motor vehicles. The assessors determined that the actual value of the plaintiff's real and personal property on October 1, 1954, was $2,496,460 and $6,119,672, respectively. The assessors further determined that all of the taxable real estate in Bristol had, as of the same date, an actual value of $145,650,320, and the personalty an actual value of $48,382,958, or a total of $194,033,278. The assessors

then set in the tax list of that year the plaintiff's real estate at $1,248,230; its personalty other than motor vehicles at $5,501,770; and its motor vehicles at $6600; the three amounts being 50 per cent, 90 per cent and 100 per cent, respectively, of the actual values previously determined. These listings made a total assessment against the plaintiff of $6,756,600.

Using comparable methods and percentages, the assessors set in the tax list all of the taxable realty within the town at $72,825,160; all of the taxable personalty other than motor vehicles at $33,755,930; and all of the motor vehicles at $10,876,370. After legal exemptions of $3,951,220 had been applied to these three classifications and after minor adjust-. ments had been made on the application of property owners not parties to this action, the grand list totaled $113,314,360.

The sum of $8,616,132, the actual value of all of the plaintiff's property as determined by the assessors, was 4.447 per cent of the actual value of all the taxable property in the town. The sum of $6,756,600, the assessed value of all the plaintiff's property, was 5.962 per cent of the grand list of the town.

Within the time prescribed by law, the plaintiff appealed to the board of tax review for a reduction in the assessment of its personalty, but the appeal was dismissed. Thereupon the plaintiff instituted this proceeding, which has been briefed and argued as an application in the nature of an appeal to the Court of Common Pleas under General Statutes § 1800, and we so construe it. The parties having stipulated in the Court of Common Pleas as to the foregoing facts, the case has been reserved for advice upon the four questions.[1] Essentially, these

[1] "1. Did the Assessors and the Board of Tax Review of the town of Bristol err in determining that all the Plaintiff's real and

questions present the single issue whether or not the assessors can, by using a higher percentage of the actual value of personalty than they do of real estate in making assessments, impose upon the plaintiff the obligation of paying a greater proportionate amount of taxes than those assessed, let us say, for only real estate.

The assessing of property at a fraction of its actual value undoubtedly is so widespread that most, if not all, of the municipalities in the state pursue the practice. This rule of assessment has been tolerated for so long a time that it has acquired the respectability of assumed legality. The practice, however, is clearly improper. Section 1738 of the General Statutes provides that taxable realty "shall be liable to taxation at its present true and actual valuation," and § 1047d of the 1955 Cumulative Supplement provides that all items of taxable personalty

personal property should be assessed and set [in] the Grand List of October 1, 1954, at 5.962% of the assessed value of all taxable property in the town, when the true and actual value of said property as determined by them was only 4.447% of the true and actual value of all taxable property in the town as determined by them?

"2. Did the Assessors and the Board of Tax Review of the town of Bristol err in setting the Plaintiff's personal property, other than its motor vehicles, [in] said Grand List at 90% of its true and actual value as determined by them and by setting its motor vehicles [in the] Grand List at 100% of their true and actual value as determined by them, when all of the taxable real property located in the town was set [in] said list at only 50% of its true and actual value as determined by them?

"3. Did the Defendant Board err in refusing to reduce the assessment of all Plaintiff's personal property at 50% of its true and actual value?

"4. Did the [defendant] Board err in refusing to correct the assessment of all Plaintiff's real and personal property [in] said list so that it would be 4.447% of the assessed value of all the taxable real and personal property in the town, when the true and actual value of all Plaintiff's real and personal property was only 4.447% of the true and actual value of all the taxable real and personal property located in the town?"

shall be set in the list of the owner "at their then
actual valuation." Since a municipality has no au-
thority to tax except as granted by the General As-
sembly, statutes conferring authority to tax must be
strictly observed. *Thames Mfg. Co.* v. *Lathrop,* 7
Conn. 550, 556. The unambiguous language of the
two statutes just mentioned gives assessors no war-
rant to utilize as a tax base any value other than the
actual value of the property. Indeed, the language
impliedly forbids the adoption of any different base.

The impropriety of fractional valuation is mani-
fest from the history of §§ 1738 and 1047d. Prior to
1860, the General Assembly specifically authorized
assessments of real estate and personalty at per-
centages of their valuation. For example, in 1821
the statute provided that "[d]welling-houses, with
the buildings and lots appurtenant thereunto . . .
shall be valued at the rate which each separate
dwelling-house and lot, with the appurtenances there-
of, are worth in money, and . . . shall be set in the list
of the owner, at two per cent of such value. Lands
and separate lots . . . shall be valued and assessed by
the acre . . . and shall be set in the list, at three per
cent of such value. . . . All horses, asses and mules,
one year old, or more, shall be valued, and set in the
list at ten per cent of such value. . . . Neat cattle
one year old, or more, shall be valued, and set in the
list, at six per cent of such value. Silver plate, ex-
cept spoons, . . . shall be valued, and set in the list,
at twenty-five per cent of such value. Clocks,
watches and time-pieces shall be valued, and set in
the list, at fifty per cent of such value." Statutes,
1821, p. 446, § 2. This legislative policy of requir-
ing the assessment of property at fractional valua-
tion remained in effect for forty years more, al-
though the percentages were changed from time to

time and eventually were stabilized at 3 per cent for both personalty and realty.[2]

In 1860, the General Assembly passed an act reciting "[t]hat all property on which, by the laws of this state, taxes may be laid, shall be set in the list at its actual valuation, and not as heretofore at three per cent. of such valuation." Public Acts 1860, c. 15, § 1. The assembly thus abandoned, in the clearest sort of manner, the previous method of fractional valuation and directed the rule of assessment to be the actual value of the taxable property. This important change in legislative policy was continued and is to be noted in the Revisions of 1866 and 1875. Rev. 1866, p. 708 § 7, p. 709 § 8; Rev. 1875, p. 155 § 13, p. 156 § 14. The direction found in the two sections of the latter citation is to set real estate at its "true and actual valuation" and personalty at its "actual valuation." It should be stated, parenthetically, that the expressions "true and actual valuation" and "actual valuation" mean the same thing, and they are also synonymous with "market value," "market price" and "fair value." *Sibley* v. *Middlefield,* 143 Conn. 100, 106, 120 A.2d 77. The sections in the Revision of 1875 were continued in almost identical form, and appear in the 1949 Revision as §§ 1738 and 1745.[3] The latter section was amended

---

[2] For comparable succeeding statutes see Statutes, 1824, p. 402, § 2; Statutes, 1838, p. 597, § 2; Statutes, 1849, p. 604, § 14 et seq.; Statutes, 1854, p. 839, §§ 7, 8.

[3] The language of the 1875 Revision appeared in the Revision of 1888, §§ 3827-3829, and in the Revision of 1902, §§ 2322-2324, except for the addition of barges and registered vessels to the list of taxable personal property. The language underwent very minor changes in the Revision of 1918, §§ 1183-1185, and in the Revision of 1930, §§ 1143, 1147, 1150, with the exception that § 1134 of the 1918 Revision was added at the end of § 1143 of the 1930 Revision and the provisions of chapters 162 and 204 of the Public Acts of 1923 were added to § 1147 of the 1930 Revision. Sections 1143 and 1147 of the

in 1953 (Cum. Sup. 1953, § 848c) in a particular not material to this case and is now § 1047d. Thus, the history of the statutes discloses the unequivocal legislative intent, as expressed in the public act of 1860 and followed ever since, that all taxable property "shall be set in the list at its actual valuation, and not as heretofore at [a] per cent. of such valuation."

Nor can we overlook a further matter in demonstrating the impropriety of pursuing the rule of fractional valuation. When assessors adopt such a rule, they indirectly assume a role which rightfully is not theirs to play. For, if such a rule is applied, the grand list will obviously be smaller in amount than it would be if the mandate of the statute were carried out. Under such circumstances, the borrowing power of the municipality is affected, since its indebtedness may not exceed specified percentages of the grand list. Cum. Sup. 1955, § 363d, as amended, Nov. 1955 Sup., §§ N8, N119. Assessors who use fractional valuation to determine their assessments therefore interfere, perhaps unwittingly but nonetheless effectively, with a power which legally belongs to others.

It is apparent, then, that the Bristol assessors acted contrary to the statutes, and hence illegally, in listing the plaintiff's real estate at 50 per cent of its actual value and the personalty, other than motor vehicles, at 90 per cent of that value. *Slosberg* v. *Norwich*, 115 Conn. 578, 162 A. 772; *Dennis' Appeal*, 72 Conn. 369, 372, 44 A. 545; *Ives* v. *Goshen*, 63 Conn. 79, 82, 26 A. 845; *White* v. *Portland*, 63 Conn. 18, 22, 26 A. 342. It does not, however, necessarily follow that the plaintiff is entitled to relief.

1930 Revision appear unchanged in the Revision of 1949, §§ 1738, 1745, except for a minor change in the order of words in § 1738 created by § 364c of the 1935 Cumulative Supplement.

Section 1800 of the General Statutes provides for such an appeal as was taken in the case at bar to the Court of Common Pleas from the action of the board of tax review in denying the plaintiff the relief it sought from the doings of the Bristol assessors.[4] The court is empowered by the statute "to grant such relief as shall to justice and equity appertain." Some sixty odd years ago this court handed down an opinion in *Randell* v. *Bridgeport,* 63 Conn. 321, 28 A. 523. A summary of the facts in that case is this: It was the uniform rule of the Bridgeport board of assessors to assess taxable property at half its actual value. This was contrary to the statutes, which required assessments to be made at actual value. Rev. 1888, §§ 3827, 3831. In 1891, the board assessed the plaintiffs' real estate at a figure in excess of such half. Failing to obtain relief from the board of relief, the plaintiffs appealed to the court. The statute then in effect provided, like the applicable present statute, that the "court shall have power to grant such relief as shall to justice and equity appertain." Rev. 1888, § 3863. We said (p. 323): "There are two ways in which a taxpayer may be wronged in levying taxes. An assessment may conform to the statute generally, and the individual may be assessed in excess of the statutory requirement. A wrong of that description is easily redressed. But when the town disregards the statute and establishes a rule of its own, assessing the property at one half of its actual value, and then assesses

---

[4] "Sec. 1800. APPEAL FROM BOARD OF TAX REVIEW. Any person claiming to be aggrieved by the action of the board of tax review in any town or city may . . . make application, in the nature of an appeal therefrom, to the court of common pleas . . . . The court shall have power to grant such relief as shall to justice and equity appertain, upon such terms and in such manner and form as shall appear equitable . . . ."

an individual at the full value of the property, while the injury is the same the application of the remedy becomes more complicated. Practically the only way to redress the wrong is to reduce the assessment; and that makes the court seem to disregard the statute; while if the wrong is not redressed there is a denial of justice; and the court practically ignores the statute giving an aggrieved party an appeal, and practically ignores the statute which provides that 'said court shall have power to grant such relief as shall to justice and equity appertain.' . . . Thus we are in a dilemma. If we choose one horn of it a public statute is violated—not so much by the court as by the town—but by an apparent approval of the court as to one individual; and that by an express command of another statute, and by the dictates of justice. If we take the other horn the court itself violates a remedial statute, and becomes in a measure a party to the wrong doing. Under the circumstances we do not hesitate to choose the former, and to redress the wrong." In other words we held that, although a judicial reduction of an assessment of property below its actual value was accomplishing what the statute forbade, the reduction was legally warranted under the language "[the] court shall have power to grant such relief as shall to justice and equity appertain."

The language quoted from § 1800 appears to give to the court broad equitable powers to adjust inequalities in the assessment of property for purposes of taxation. We cannot, however, construe it as expressing a legislative intent to confer upon the court the power to adjust inequalities in the assessed values of property when those values have been reached by applying a percentage of less than 100 per cent of the actual values of the property assessed,

in direct violation of the mandate contained in §§ 1738 and 1047d. To make such an adjustment would necessarily result in the court's fixing a value below that prescribed by the statutes. Notwithstanding our recognition in the *Randell* case, supra, that the statutes required the assessors to place property in the tax list at 100 per cent of its actual value, we granted the plaintiffs in that case relief by fixing a valuation at less than 100 per cent of such value. The view which we take in the instant case is contrary to this, and the *Randell* case must therefore be overruled.

We are unable to give categorical answers to the questions propounded. We can answer only generally by stating that the assessors acted contrary to law in assessing the plaintiff's property, save the motor vehicles, and that the board of tax review did not act illegally in refusing the plaintiff's request for reduction of the assessments of its personalty.

No costs will be taxed in this court to either party.

In this opinion the other judges concurred.